The State, ex rel. Northeast Property Owners Civic Assn., Inc., et al., *v.* Kennedy et al.*

(No. 25323—Decided December 21, 1961.)

---

*Appeal dismissed, 174 Ohio St., 111.

80

*Messrs. Chapman & Chapman,* for relators.
*Messrs. Clark & Chase,* for respondents.

KOVACHY, P. J.   This is an action in quo warranto instituted in this court.

The relators, The Northeast Property Owners Civic Association, Inc., an Ohio corporation not for profit, and William T. Bohatch, Mabel Featherston, Albin J. Pecek, and Nellie Behrendt, who claim to be its duly elected officers, allege that respondents, Gordon J. Kennedy, Stephen A. Croley, Marjorie Egan and Margaret Clarke, are usurping the offices of president, first vice-president, second vice-president and secretary, respectively, of the association, and pray that they be ousted from such offices.

The essential facts are clear.   The respondents were duly elected to their respective offices and entered upon their duties January 1, 1960.   Written charges recommending the removal of the respondents as officers of the association, signed by all members of the executive board (board of trustees) were presented at the May 10, 1960, regular monthly meeting of the association.   At the same meeting a motion for such removal was made and seconded.   The meeting, however, was adjourned before a vote was taken on the motion.   The executive board, at its meeting held May 20, 1960, decided, *inter alia,* (1) to notify members of future meetings by postal card; (2) to limit the attendance at the regular June meeting of the association to members with 1959-1960 membership cards; (3) to suspend the officers ''up on charges''; and (4) to send notices of the next meeting ''as soon as it [executive board] had a place to meet.'' In order to emphasize the importance of this regular monthly meeting, the postal card carried the expression, ''This is a special meeting.''

The regular June meeting of the association was called by the executive board and held on June 14, 1960, at 12907 St. Clair Avenue and in accordance with action taken by the executive board at its May 20, 1960, meeting, only members in good standing attended.   None of the respondents, although duly notified and although present at the regular board meeting on May 20, 1960, were present.   Two hundred fifty members of the association attended.   The first order of business was the

election of president, secretary, and sergeant-at-arms pro tem. The minutes of the last executive board meeting were read and "the actions of the board were individually and collectively approved and adopted," with one dissenting vote. A vote was taken on the motion for the removal of the respondent officers and carried "unanimously except for one vote." A motion was then made and carried to proceed to elect officers to fill the vacated offices for the unexpired terms. Nominations for president, first vice-president, second vice-president and secretary were made, with one nominee for each office. "In each instance a motion was made, duly seconded and carried that the secretary be instructed to cast a unanimous ballot for each of said officers."

At the May 20, 1960, board meeting, respondent Kennedy, then president, announced that he refused to abide by the action of the board in limiting the attendance at the regular June meeting of the association to members in good standing only and intended "to invite whomever he pleases," and thereafter called and held a meeting, purportedly the monthly June meeting of the association, at the Glenville Y.M.C.A., 11111 St. Clair Avenue. Notices for this meeting were sent by him by letters in sealed envelopes. Twenty-nine members in all attended this meeting.

Article III, Section I of the Constitution of the association, as amended November 1957, reads:

"The elective officers of this association shall be a president, a 1st vice-president, a 2nd vice-president, secretary, treasurer, sergeant-at-arms, election board of three members and an executive board of seven members and seven alternate members."

Pertinent parts of the bylaws read as follows:

Article I, Section I:

"Regular meetings of the association shall be held on the second Tuesday of each month, at 8:00 p. m. * * *."

Article III:

"President: The president shall preside at all meetings of the entire association and the executive board, enforce order and observance of the constitution and bylaws, sign all orders and checks on the treasurer authorized by the association or the executive board, and appoint all committees unless otherwise provided for. * * *

"Executive Board: The executive board shall:

"1. Carry on the ordinary business of the association between meetings.

"2. Take cognizance of, study and make recommendations to the association at any meeting regarding problems of general interest to the association and the community.

"3. Hold not less than one meeting a month, which shall be at least one week prior to the regular meeting of the association."

It seems clear to us, from the above excerpts from the constitution and bylaws of the association, that the powers of the president are expressly stated and his duties limited in scope, and that the responsibility for the conductance of the ordinary affairs of the organization "between monthly meetings" rests with the executive board. This being so, the authority to designate the place and to determine the form and manner of notifying members of the June monthly meeting resided with that body and not with the president. It necessarily follows, therefore, that the June monthly meeting called and held by the board was valid and any other meeting called purportedly on behalf of the association lacked validity and was of no effect.

Pertinent parts of Section 1702.34 of the Revised Code read as follows:

. "(B) Unless the articles or the regulations otherwise provide:

"(* * *

"(2) *Any officer may be removed, with or without cause, by the persons authorized to elect or appoint him* without prejudice to the contract rights of such officer. The election or appointment of an officer for a given term, or a general provision in the articles, the regulations, or the bylaws with respect to term of office, shall not be deemed to create contract rights * * *." (Emphasis added.)

Inasmuch as the constitution and bylaws of the association fail to deal with the question of the removal of officers, the general laws of the state of Ohio for corporations not for profit are applicable. The respondent officers, under such laws, were subject to removal, with or without cause, by the same persons authorized to elect them, namely, the members of the association. The action of the members in the removal of the officers

at the regular June meeting called by the executive board, therefore, was in accordance with law, and their removal was proper and effective. We hold, therefore, that the respondents from and after June 14, 1960, ceased to be officers of the Northeast Property Owners Civic Association, Inc.; that each is guilty of usurping and unlawfully exercising the office he or she claims to hold in the Northeast Property Owners Civic Association, Inc.; and each should be and herewith is ousted and excluded from the same.

*Judgment of ouster.*

SKEEL, J., concurs.

HURD, J., dissenting. I must respectfully dissent from the judgment for the reason that the relators have failed to establish the validity of their action in calling a special meeting by an unsigned postal card when their own constitution provides, through Article V, that regular meetings of the association shall be held on such day or days and at such hours as may be directed by the bylaws. The bylaws, in Article I, Section 1, as amended in 1955, provide, in substance, that regular meetings shall be held on the second Tuesday of each month at 8:00 p. m. The bylaws also provide that special meetings may be called "at the discretion of the chair" (meaning the president of the association). That the relators called a special meeting to be held at the same time and on the same day as the regularly convened meeting, but at a different place, by an unsigned postal card is evidenced by respondents' exhibit No. 12, which reads as follows:

"Nepoca Meeting                    June 14, 1960
            "*This Is A Special Meeting*
                "12907 St. Clair Avenue
                    "at 8:00 p. m.
"Stipulated by lessor:
"This meeting will be open to *members only*.
"We expect to vote to issue *free membership* for 1960-61 to our 1959-60 members in good standing. There are other *vital* matters to be voted on at this time.
"We assure you, your own welfare and that of your *neighbors, demand that you attend this meeting.*

"Have your membership checked against the records."

It will be noted that the words, "This is a special meeting," are emphasized. The postmark on the unsigned postal card is dated June 11th for a special meeting to be held on June 14th which constitutes a violation of Section 1702.18, Revised Code, which, in substance, provides that the purpose for which a special meeting is called shall be given either by person or by mail not less than 10 nor more than 60 days before the date of the meeting. The postcard notice of the so-called special meeting, therefore, was invalid for four reasons, namely, (1) it was unsigned and, therefore, anonymous; (2) it was only three days before the so-called special meeting; (3) it failed to state the purpose of the special meeting; and (4) because it was called at the same time as but at a different place than the regular scheduled meeting which had been convened according to the constitution and bylaws, and at which meeting the ouster of the officers was considered and voted down by the members. It follows, therefore, that whatever resolutions were adopted at the so-called special meeting by the dissident group, the relators in this case, were void and of no effect and should be held for naught by this court.

An action in quo warranto is a high prerogative writ and an extraordinary remedy which should be exercised with due caution and discretion. See 45 Ohio Jurisprudence (2d), 614, Section 4. The relators, therefore, must establish a clear right to the issuance of the writ, which obviously, for the reasons herein stated, they have failed to do.

It is my conclusion, therefore, that the relators are without standing in this court and that the writ in quo warranto should be denied.

(Decided April 12, 1962.)

ON REHEARING.

SKEEL, J. This is an action in quo warranto invoking the original jurisdiction of this court seeking to test the right of the respondents to act as the officers of the Northeast Property Owners Civic Association, Inc. The case is before the court on rehearing, a motion for new trial having been granted.

The petition alleges that the Northeast Property Owners Civic Association, Inc., is a nonprofit corporation duly organized and existing under the laws of the state of Ohio; that on December 8, 1959, the respondents, Gordon J. Kennedy, Stephen A. Croley, Marjorie Egan and Margaret Clarke, were purportedly elected to their respective offices in the corporation, that is, as president, first vice-president, second vice-president and secretary, respectively; that the bylaws of the corporation prescribe the qualifications of members to become eligible for an elective office of the association and that the respondents did not have such qualifications; that on May 10, 1960, and on June 14, 1960, meetings were held, and, upon proper motion made at the May 10th meeting, which motion was voted upon at the June 14th meeting by the membership, the respondents were voted out of office under the authority of the statutes of Ohio and the bylaws of the association; that other officers were elected to fill the vacancies for the unexpired terms, such new officers being the relators in this case; and that, in spite of the action of the membership, the respondents pretended to act for and are attempting to exercise the powers and franchise of the corporation and to exclude the relators from the offices to which they have been duly elected.

The answer of the respondents admits the incorporation of the Northeast Property Owners Civic Association, Inc., as a nonprofit corporation and alleges that its principal office is located at 673 East 127th Street (which is the home of Kennedy) instead of as alleged in relators' petition, although no address is set out therein. The respondents admit their election as officers of the association, as alleged, on December 8, 1959. All other allegations of the petition are denied. They (the respondents) allege that they were installed in their respective offics on January 12, 1960, for a term of one year or until their successors shall be elected and qualify for the various offices as provided by Article III of the constitution and Article II of the bylaws of the association.

It is also alleged that the conduct of the business of the corporation, from January 1, 1960, until the regular monthly meeting of the membership on May 10, 1960, was under the management and control of such officers when the relators and some of the executive board of the association, on or about such

date, began a campaign of usurping, intruding and unlawfully interfering with the respondents in the exercise of their duties, and that a motion to oust the respondents from their offices was introduced at the regular meeting of May 10, 1960, but a vote on such motion was deferred until the regular meeting to be held on June 14, 1960; that the relators in disregard of the notice of the place where the June meeting was to be held pretended to hold a separate meeting on the same date but at a different place; and that, contrary to law and the regulations of the corporation, the relators have pretended to and did unlawfully oust the respondents from office and now pretend to conduct the affairs of the association.

By reply, the affirmative allegations and those alleging new matter as a defense to the answer were put into issue by a general denial. The reply then sets out a narrative recital of the association's regulations and bylaws which, among other things, provide that the executive board shall carry on the business of the association between meetings; that the board shall hold one meeting a month one week prior to the regular meeting, which regular monthly meeting of the members is to be held on the second Tuesday of each month; and that the duties of the president are limited to the power to preside at meetings of both the association and the board, to sign orders on the association's account upon authority of the board, to appoint committees unless otherwise provided, and to fill vacancies of offices, excepting those of the executive board.

It is then alleged that Kennedy, shortly after becoming president, in concert with the other respondents, attempted to take over and run the association, usurping the duties of the board and acting in the name of the association, against the express decisions of such board and in derogation of the purposes and objects of the association. It is alleged further that the respondents, notwithstanding the regulations, published the April issue of NEPOCA News without authority and, in direct defiance of the orders of the board, issued what might be called the May issue of such publication, addressed to the public, and had 5,000 copies printed and delivered throughout the neighborhood by the printing company at the expense of the association; that at the May meeting a motion to remove the respondents as officers was made and seconded, and while the ballots were be-

ing prepared, Kennedy adjourned the meeting without a vote; that at a meeting of the board, held May 20, 1960, it was reported that the place where the association had been holding its monthly meetings was no longer available and that the membership would be notified by the board as to the place of the monthly meeting to be held on June 14th as soon as it could find a suitable place; that it was decided by the board on May 20th (the president and other respondents being present) that consideration of the motion to remove the respondents as officers should be considered at the June 14th meeting of the membership; and that at the meeting of June 14th, under unfinished business, a resolution was adopted removing the respondents as officers and by a vote of all but one member present (some 250 members attending) the relators were elected to said offices.

The primary question in this case is whether the notice sent to the membership of the time and place of holding the regular meeting of the association to be held under the bylaws on June 14, 1960, was proper and effective. It had been the practice to publish such notice in the NEPOCA News. This practice, by order of the board, was discontinued as shown by a vote of the board on May 20th. The problem of where the association would hold its next regular monthly meeting was brought about because the landlord controlling the place where such meetings had been held previously notified the association that the rooms were no longer available to them for that purpose. The last paragraph of the minutes of the meeting of the board on May 20th (such minutes being introduced in evidence) provides:

"Mention having been made of the next meeting, Mr. Kennedy asked who would send the notices out. Mr. Sharp, as spokesman for the board, said that the board would send them out as soon as it had a place to meet."

Thereafter, the board caused a post card notice to be sent to the members advising them that the NEPOCA June meeting would be held June 14, 1960. The card set out "This is a special meeting." The place where the meeting was to be held was designated as 12907 St. Clair Avenue. The card noted also that the meeting would be open to members only as declared by the board at its May 20th meeting, which meeting was presided over by Kennedy. The evidence clearly shows that this card was sent out by the board and that the meeting was intended to

be the regular June 1960 monthly meeting. The president, Kennedy, testified that he received a copy of this notice.

The president, one of the respondents herein, sent a "memorandum," dated June 10, 1960, to the membership, publicizing his views of the shortcomings of the executive board and his convictions as to the needs of the association for his aggressive leadership and suggesting that the board's desire to dismiss the officers who believe in progress was a do-nothing group. The "memorandum" concluded with a statement that the next regular meeting of NEPOCA would be held at the Glenville Y.M.C.A., 11111 St. Clair Avenue, on June 14, 1960, at 8:00 p. m. This "memorandum" was mailed by first-class mail, after the meeting of the board on May 20th, without authority of the board, and at the expense of the association. Before coming to the issue presented by the pleadings, the occurrences of what took place at the membership meeting of May 10, 1960, should be mentioned.

As indicated by the reply, prior to the association's regular meeting of May 10, 1960, the president, a respondent herein, without authority from the board and, in fact, in defiance of its direct orders as shown by the letter of the board to the publisher received as an exhibit in the evidence, published the May issue of NEPOCA News. As indicated, and by his admission, 5,000 copies were printed and delivered, presumably inviting a number of nonmembers to attend the regular May meeting. At the same time the board mailed a post card notice of the meeting which stated that the meeting would be open to members only. According to the testimony of the president, the proceedings at the May 10th meeting of the association were far from orderly. Charges against the president were filed and a motion to dismiss the president, first vice-president, second vice-president and secretary from office, was made and, as the ballots were about to be distributed to the members present, the president adjourned the meeting without vote.

There was a meeting of the board on May 20th at the home of Mrs. Egan, one of the respondents. It was voted by the board to discontinue NEPOCA News, it being suggested that notices of the meeting be sent by post card as was done formerly. The president made certain accusations against the board members and said that he was going to bring charges against

them, but no action was taken after some alleged bad tactics of his (Kennedy's) group were suggested. A motion was carried to suspend the membership drive and to suggest to the membership meeting of June 14th that all present members in good standing be given membership cards without further dues until July 1961. A motion was carried that attendance of the June meeting be limited to members only. When this resolution was passed, the president said ''I refuse to abide by this decision. I still intend to invite whomever I please'' A motion was also made and carried to suspend all officers who were ''up on charges'' until the motion was voted on at the next meeting (the meeting of June 14th). The president was then told that the board would send out the notice for the June meeting.

There were two meetings held on June 14, 1960. About 29 members responded to the meeting for which the president sent out notice of the time and place in his memorandum of June 10th. Over 200 members (probably about 250) responded to the notice sent out by the board, which stated that the place of the meeting would be 12907 St. Clair Avenue. We are not favored with the minutes of the so-called president's meeting held in the Y.M.C.A., 11111 St. Clair Avenue, but the evidence shows that at this meeting the charges against the officers were considered and voted upon and the charges were dismissed. The minutes of the meeting called by the board are in evidence and recite that it was a closed meeting as per the action of the executive board at its meeting of May 20th. The minutes note the absence of the respondents and show that the resolution dismissing the officers (respondents herein) was passed and that new officers were thereafter nominated and elected. The minutes also show that the membership adopted the recommendations of the board to discontinue publication of NEPOCA News and to grant extended membership cards without payment of further dues, reciting that the balance in the treasury was sufficiently large to forego such income. The minutes show further a repudiation of or responsibility for the debts incurred by the president in publishing and distributing the unauthorized ''memorandum'' in May.

The principal issue here to be considered is whether or not the officers (respondents herein) were lawfully dismissed from office on June 14th at the meeting of the association held upon

notice of the executive board. In considering this issue, we are not concerned with any question of policy to be followed in the management of the affairs of the association. Such questions come solely within the province of the association, acting through the executive board, within the powers granted to it and the board by its charter, constitution and bylaws.

A corporation not for profit may be organized and, as organized, is subject to the provisions of Chapter 1702 of the Revised Code. Section 1702.30, Revised Code, provides:

"Except where the law, the articles, or the regulations require that action be otherwise authorized or taken, all of the authority of a corporation shall be exercised by its trustees. For their own government the trustees may adopt bylaws not inconsistent with the articles or the regulations."

The trustees, as required by statute, are the governing body of a corporation not for profit and in the organization of the Northeast Property Owners Civic Association, Inc., are designated the "executive board." There were seven members of the executive board to be elected by the membership and seven alternates, also thus elected. For purposes of election, their terms of office were staggered. The elective officers elected by the membership, as provided by the constitution and bylaws, are the president, two vice-presidents, a secretary, a treasurer, a sergeant-at-arms, three members of the board of elections, and the executive board.

The bylaws of the association define the duties of the officers and the board. The duties of the president are set out in Article III of the bylaws, as follows:

"President: The president shall preside at all meetings of the entire association and the executive board, enforce order and observance of the constitution and by-laws, sign all orders and checks on the treasurer authorized by the association or the executive board, and appoint all committees unless otherwise provided for. He shall be a member ex-officio of all committees. The president shall have the power of appointment to fill any vacancy for the unexpired term of any office caused by death, resignation or otherwise, except that in the case of the death, resignation or otherwise of any member of the executive board, the vacancy or vacancies shall be filled by the alternate members of the executive board."

The duties of the executive board, as provided for in Article III of the bylaws, are as follows:

"The executive board shall:

"1. Carry on the ordinary business of the association between meetings.

"2. Take cognizance of, study and make recommendations to the association at any meeting regarding problems of general interest to the association and the community.

"3. Hold not less than one meeting a month, which shall be at least one week prior to the regular meeting of the association.

"4. Advise on editorial policy of NEPOCA News.

"5. Have general supervision of the finances of the association and shall audit the books of the secretary and treasurer in January and July.

"6. Adopt such rules governing its own conduct as it deems necessary, except that not less than five members shall constitute a quorum necessary to do business."

Under these provisions, any business matters or determination of policy needing immediate attention between monthly meetings come solely within the powers conferred upon the board and not upon the president. The record makes it clear that after the May meeting, the authorities controlling the place where the association had been meeting (St. John's Hall, 757 Eddy Road) cancelled the association's right to the use of the hall for further meetings. Finding a new place which would undoubtedly require pledging the credit of the association required action by the board, and the president, without direction from the board, was without authority to attempt to usurp the board's authority in this respect. The place chosen by the board was, therefore, the place where the association's monthly meeting of June 14th was to be held and the president was without power to designate a different place. That the members, having knowledge of the constitution and bylaws of the association, understood the exclusive authority of the board to provide a place to meet when the usual place of meeting had been taken away after the meeting of May 10th, is supported by the fact that only 29 members responded to the letter sent out by the president designating a new meeting place, while about 250 members followed the instructions as to the new meeting place, directed by the board.

It was legally unnecessary to send notices of the day and time of holding the regular monthly meetings of the association for the reason that the time when such meetings should be held was provided by its constitution and bylaws. Article V, Section I of the constitution provides:

"A regular meeting for the transaction of business shall be held on such day, or days, and at such hour as may be directed by the By-Laws."

The bylaws provide:

"Article I—Meetings

"Section I—Regular meetings of the association shall be held on the second Tuesday of each month, at 8:00 p. m. In the event a meeting date falls on a legal holiday, the meeting shall be held on the following Tuesday at 8:00 p. m. Special meetings may be called at the discretion of the chair. The annual meeting shall be held on the second Tuesday in December."

In the case of *State, ex rel. Carpenter, Pros. Atty.*, v. *Kreutzer,* 100 Ohio St., 246, the court said in the second paragraph of the syllabus:

"Where the regulations of a corporation definitely fix the place, the day and the hour of the annual meeting at which members of the board of directors are to be elected, no further notice of such meeting to the stockholders of the corporation is necessary unless required by such regulations."

There are no provisions, either in the constitution or the bylaws of the Northeast Property Owners Civic Association, Inc., requiring notice of the time and place of the meetings provided for by the constitution and bylaws. If it be assumed that such notice was required (which is not the fact), then the provisions of Section 1702.18, Revised Code, provide that unless the articles or regulations (of a nonprofit corporation) provide for notice of meetings otherwise than provided in this section, written notice stating the time and place of a meeting of the voting members, and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be given either by personal delivery or by mail not less than ten days or more than sixty days before the date of the meeting. The notice sent out by the president was dated June 10, 1960, and the meeting was by the bylaws to be held and was held on June 14th so that this notice did not comply with the statute.

We must conclude that the meeting (held at 12907 St. Clair Avenue, June 14, 1960) called, under the provisions of the by-laws, at a place designated by the executive board upon timely notice, as to the place where the meeting was to be held and which was attended by about 250 members (the number of members attending a meeting necessary to fulfill the requirements of a quorum is not less than 25 members) was the legal meeting of the Northeast Property Owners Civic Association, Inc., and was legally empowered to transact the regular business of the association presented for its consideration.

There remains for consideration the question of whether the voting members of the association had the power to remove any or all of the officers who were elected by them at the annual meeting held December 8, 1959, at the membership meetings of May 10 and June 14, 1960.

Section 1702.34, Revised Code, in part, provides:

"(B) Unless the articles or the regulations otherwise provide:
"* * *

"(2) Any officer may be removed, with or without cause, by the persons authorized to elect or appoint him without prejudice to the contract rights of such officer. The election or appointment of an officer for a given term, or a general provision in the articles, the regulations, or the bylaws with respect to term of office, shall not be deemed to create contract rights;

"(3) The persons authorized to elect or appoint officers may fill any vacancy in any office occurring from whatever reason."

The respondents are, by the allegations of the pleadings, officers elected to office by the vote of the members of the association. They are, therefore, subject to the provisions of this section. The evidence is uncontradicted that at the regular meeting of May 10, 1960, a resolution or motion was introduced to remove the respondents from their respective offices as officers of the Northeast Property Owners Civic Association, Inc., to which offices they had been elected by the membership on December 8, 1959, and that at the regular meeting of June 14th, the membership passed the said resolution or motion removing the respondents from their respective offices. The power to remove such officers is clearly provided by Section 1702.34, Revised Code.

The relators were nominated and elected to their respective offices after such offices were vacated, as just indicated. They thereupon became the legal officers of the association.

A decree is, therefore, entered as prayed for by the relators.

*Judgment adhered to.*

KOVACHY, P. J., concurs.

HURD, J., dissenting. As I view this case on rehearing, the relators' action in quo warranto to oust the present officers of the association hangs upon the thin, tenuous thread of an invalid "special meeting" which was illegally and improperly called and convened on the same day and at the same time as the regular meeting, but at a different place. In order to prevail in this action, the relators must rely upon the business transacted at this "special meeting" which they now belatedly attempt to designate as a regular meeting. A copy of the notice of the meeting, with all emphasis supplied by them, refutes their claim that it was a regular meeting. The notice, exactly as sent out, postmarked June 11th, is as follows:

"NEPOCA Meeting                    June 14, 1960
            "*This Is A Special Meeting*
            "12907 St. Clair Avenue
                "at 8:00 P. M.

"Stipulated by Lessor:

"This meeting will be open to *members only*

"We expect to vote to issue *free membership* for 1960-61 to our 1959-60 members in good standing. There are other *vital* matters to be voted on at this time.

"We assure you, your own welfare and that of your *neighbors, demand that you attend this meeting.*

"Have your membership checked against the records."

This meeting cannot qualify as a "special meeting" for a number of reasons:

1) It is a violation of Article I, Section I of the bylaws, as amended in 1955, which provides that "special meetings" may be called at the discretion of the chair (president). The record shows that the respondents called and convened the regular meeting in accordance with the bylaws which provide that regu-

lar meetings shall be held on the second Tuesday of each month at 8:00 p. m. The record also shows that the president, in co-operation with the editor of the NEPOCA News, had always notified the members of the time and place of the regular meeting. It was not until after the regular meeting was properly called that the "special meeting," described above, was improperly and illegally called at the same time but at a different place.

2) It is a violation of Section 1702.18, Revised Code, which provides that in case of a "special meeting" the purpose or purposes for which the meeting is called shall be given either by person or by mail not less than ten nor more than sixty days before the date of the meeting. The three-day notice, therefore, was not sufficient in law.

3) The notice failed to state the purpose of this "special meeting."

4) The notice was unsigned and, therefore, anonymous.

5) The relators, claiming responsibility for the unsigned notice of the "special meeting," failed to give notice to all members of the association of the unusual business they proposed to transact, namely, to vote the present officers out of office and to elect others to take their place, contrary to law.

6) The notice held out a lure or inducement to members to attend this "special meeting" to the effect that they expected to vote free membership for 1960-61 to "our 1959-60 members in good standing." This inducement was illegal and unauthorized and was, in effect, an amendment to Article IV of the bylaws which provides for the payment of dues for the year 1960-61. Article V of the bylaws, concerning amendments, provides the manner in which the bylaws may be amended. It requires that any proposed amendment shall be submitted in writing at a regular meeting which shall be acted upon at the next regular meeting, a vote of two-thirds of those present being necessary to carry. It provides further that the regular notice of the meeting at which such proposed amendment shall be voted upon shall include a notice of the proposed action.

At the regularly scheduled meeting at which a quorum was present, the ouster of the officers was considered and voted down by the membership.

An action in quo warranto is a high prerogative writ and

an extraordinary remedy which should be exercised with due caution and discretion. See 45 Ohio Jurisprudence (2d), 614, Section 4.

For the reasons stated, the "special meeting" was void *ab initio,* and any action there taken was a complete nullity. It follows, therefore, that this "special meeting" cannot form the basis of an action for an ouster of the regularly elected officers in an action in quo warranto. Consequently, the writ in quo warranto should be denied.